Number 2340582, Petteway v. Galveston County, and I hear first from Ms. Valalde. Good morning. May it please the court. This case squarely presents the legal question of whether the Voting Rights Act, or the VRA, can protect a coalition minority group. I intend to divide my time today between two sections. First is to address why coalition claims are not protected under the VRA, and secondly to address why Jingle's preconditions in this case cannot be met by this coalition. I think you need to speak into the microphone. Is that better? Yes. Thank you. All right, now in Galveston County. Do you lose if you don't win on the coalition claim? Absolutely not, Your Honor. Coalition aside— I'm sorry, I didn't understand your comment. We do— What? Not. Not. We do not lose if the court finds against the coalition because we do not have compactness as a matter of law. Same thing with cohesion and the ignoring of political issues through the three Jingle's preconditions. Okay, so in Galveston County, the black and Hispanic population, everyone agrees, is insufficient to, on its own, black or Hispanic, to create a majority-minority district, so they have to come together to create a coalition. That's why, in this case, we have a square presentation of this legal issue. Now, I understand on the other side, our friends have asked or stated that this panel's hands are particularly tied by the rule of orderliness. And to that, we have two responses, which is, the first is, it is worthwhile to take a look at the opinions that have issued from the Fifth Circuit, take a close look, and to see what exactly would need to be overruled in order to talk about these coalition claims. Now, Judge Jones, in her concurring opinion in Clements, at 894 Note 1, talks about the weight and the authority of the en banc opinion in the Clements court. And she states that, although the en banc majority opinion adopts the minority coalition theory for certain aspects of its analysis, those points are not essential to its result. Furthermore, with respect to the Campos panel opinion, she states that that panel stated, without citation or further reasoning, that the VRA does not prohibit such claims. Similarly, other panels that have allowed a minority coalition claim to proceed through the Jingles preconditions have done so on the assumption that minority coalition claims can proceed under the VRA, rather than exacting an analysis of that issue prior to issuing an opinion. So for this reason, firstly, we believe that there is no clear analysis that holds minority coalition claims are allowed under the VRA. Secondly, even if the panel were to find that there is sufficient written opinion or authority in the Fifth Circuit that talks about minority coalition claims, we believe that the Supreme Court over the past 30 years has consistently rejected sub-majority claims and also political alliances under the VRA. In 2006, we have Lulak v. Perry that stated that influence districts do not get there. If you do not have a majority of your minority in a precinct, you cannot have a VRA claim. Let me, I mean, I don't wish to tell you what to argue, but of course, this panel is not going to overrule Lulak and Baytown. And so, the arguments would have to ultimately go to an en banc court or the U.S. Supreme Court. You do agree with that, right? I do believe that there is a method and a way that this panel could actually hear the case, but absolutely, should the Fifth Circuit en banc want to hear this, they could. What was your point in filing the petition for initial en banc? For efficiency, Your Honor, absolutely for efficiency. Efficiency? Efficiency purposes. This is an extremely expedited case and matter, and understanding what may happen before the panel, we would expect there would be requests for en banc hearing. May I ask you a question about the way this case evolved? It was filed in June of 22? Before that, actually. I believe it was in April of 22. April of 22, and when did discovery get underway? Discovery got underway, I believe it was within a few months, if memory serves, and it went up until the eve of trial. Okay, and was there anything, you know, was the initial request for redistricting prior to the 2022 elections? The initial request for redistricting? I'm sorry, I don't understand your question. I say, did the . . . well, I can ask them, but did the plaintiffs initially ask to have new districts drawn before the 22 election? No, Your Honor, I don't believe so. Okay. No. All right, well, moving on from the coalition theory and to readdress Judge Elrod's question about do we lose if we lose coalitions, absolutely not, we do not. And this is because we have a finding from Judge Brown in the court below that states that while the black population lives in compact areas along the center part of the county, the Hispanic population is evenly dispersed throughout. I understand my friends on the other side to state that it doesn't matter what happens outside of Precinct 3. What happens and what matters is the compactness of the population within Precinct 3. But with this finding from the court, which is at ROA 15912 paragraph 73, an even dispersal of Hispanic population within Precinct 3 is not compact as a matter of law. We have Justice Kavanaugh talking about the issue in the Allen case and his concurring opinion. He was talking about proportionality, of course, in that case. And in his point was if proportionality were not prohibited, states would be forced to group together geographically dispersed minority voters into unusually shaped districts, which is exactly what happened here. Well, now, the court has installed Map 1, hasn't it? The court has not installed Map 1. The court issued an order initially to have an illustrative plan from the plaintiff's expert installed. There was an issue with that. And the court issued a second order on October 15th stating it would be if the county didn't do its own remedial work within a few days, that it would want to install either Map 1 or this Fairfax illustrative plan. I'm sorry, go ahead. Yeah, what's occurring? I'm very confused about the current status. The current status right now is that we have the enacted plan in place. Map 2? Map 2, yes, Your Honor. So Map 2 is in place? But, okay, so the new map by October 27th in which the commissioners live in their new precincts, that did or did not happen? And the one commissioner, what happened on October 27th? You said October 15th, nothing happened. I believe it was October 13th. It was Friday the 13th that the orders came down. And it was to enact or to install the Fairfax plan. We'll just refer to it as the Fairfax plan. If the county did not take its own initiative within a few days to draw— By October 27th? Yes, Your Honor. So what, they did not do anything by October 27th? Or they did do something? We moved to stay in the district court. That was denied and we were granted additional time. And at that point then we had an appeal to this court. So there isn't—so they never did do a new map? We have not— But it's not stayed either? We are stayed— We're stayed temporarily administratively because of this hearing? Correct. But not stayed in the district court? We are not currently stayed in the district court. We are appealed from a final judgment. Right, but not from the district. So if the administrative stay were not in effect, what is the world? The world would be proceeding either above or below. Correct. And at this point while we're arguing the motion— It would be both, wouldn't it? Most likely. Most likely. It's been such a rapid progression I imagine. So what map are we supposed to be—so there is no map? I'm still confused. Right now it is Map 2. It is the Coastal Precinct Map 2 which is in place. That's the one the commissioners approved? It is absolutely the one the commissioners approved. Should this court vacate a stay and should we receive no further relief in form of a stay from any court, then we would go back down. The Galveston County commissioners would have assumably like a day or two perhaps to consider a new plan or to enact Map 1 or the Fairfax Plan is my understanding from the trial court's current order. And what is the day that they sign up? It's November 11th is the opening of the candidate filing period. When does it end? December 11th. Now the issue with Map 1, we understand the issue with the Fairfax Plan. The issue with the Fairfax Plan is it writes one of the commissioners completely out of his district. The issue with Map 1 is it's the perfect example of the failure of the political process. The commissioners had two plans available. Wait a minute. You're not going to argue that Map 1 is non-compact, are you? We are not. I was going to say since your guys proposed it. We are not. But what we are arguing is that Map 1 is a failure of the political process. It was up in front of the commissioners' court. Nobody lobbied for it. You've got to speak up. I can barely hear you. I apologize. I'm very sorry. I apologize, Your Honor. But it was up in front of the commissioners' court. Nobody lobbied for it. Nobody voted for it. And Map 2 was enacted instead. But Map 1 was basically the pre-existing district lines with a few changes, right? It was a leased change plan, correct. Okay. And even did Mr. . . . Sorry, I get Mr. Henry and Holmes confused. Mr. Holmes did not advocate for Map 1? He did not. Nor did he tell his constituents that he could have been elected under that map. Is there any explanation in the record about that? I don't know that there is a clear explanation in the record. What we do have are several lay witnesses coming up and saying that they love Commissioner Holmes. He's been their commissioner for a long time. And they had no idea when asked on the stand if they had known that Map 1 would have reelected him. And that's the record that I recall, Your Honor. Now, in terms of moving forward with this argument and this appeal, the cohesion analysis is also another reason why, even if there is a coalition that's allowed, it would fail, the judgment would fail, for lack of cohesion. The district court erred as a matter of law because it discounted what is the best evidence of lack of cohesion when you have a coalition group. Now, sufficient cohesion should be a matter of law for the court below to determine. But when you have distinct minority groups, the black and the Hispanic groups, and when you have the court's findings that race and politics are inextricably intertwined and that minorities prefer the candidate, which is usually a Democrat, and Anglos prefer the candidate, who is usually the Republican, and the district court's understanding that partisanship undoubtedly motivates voting behaviors in Galveston County, what we have is a discounting of primaries, which is the one place you're going to see where race and politics can actually be separated in order to determine how voters in Galveston County vote and whether there is cohesion among these parties or among these distinct groups. The court accepted and adopted Dr. Alford's analysis, found him to be credible, understood that Dr. Alford was very concerned with the wide confidence intervals between black and Hispanic voting patterns when you look at primaries. And Dr. Alford's opinion in the end of the day was that there was partisan polarization when it comes to voting in Galveston County with black and Hispanic voters. Now, when the court recognized all of these problems, it then discounted that best evidence of polarization, and that is an error as a matter of law because the record contains evidence that there's lack of cohesion and then the court completely discounted it. But that evidence supposedly comes more from the primaries than the general elections? It does, Your Honor. Where, in his opinion, I can't remember, can you have a cite at hand as to where Judge Brown addressed that? Yes, Your Honor. There are several places. The coalition claims saying that race and politics are inextricably intertwined and minorities prefer Democrat candidates is at 15935 and 15937 of the electronic record, paragraphs 144 to 149 of the court's findings. Right. But I'm talking about where he rejects Dr. Alford's testimony about lack of political cohesion. All right. At 15906, he finds him credible and— Where? I'm sorry, 15906, paragraph 55. And he found that primary elections had limited probative value in determining intergroup cohesion at 15928, paragraph 122. Okay. Let's see, my time is up. Okay, Ms. Klein. Good morning, Your Honors. May it please the court, Hillary Klein for the NAACP and LULAC plaintiffs. In 2021, defendants adopted a new commissioner's precinct plan that summarily carved up and wiped off the map, Galveston, Seoul, and historic majority minority precinct. The district court conducted an intensely local appraisal of the facts and faithfully applied longstanding binding precedent to find defendants' actions fundamentally contrary to the Voting Rights Act. Wait a minute. One of the commissioners is a black fellow, right? That's correct, Your Honor. So black commissioners don't count if they're of the wrong party? I'm not sure I understand— I'm just wondering. The individual commissioners are not defendants. It's the county and the commissioner's court as a whole, which as a whole acted— I know, but in the analysis, a black Republican commissioner who ran unopposed by the Democrats. What does that mean? Your Honor, I believe you're referring to Commissioner Armstrong, who was appointed to the court after the plan was adopted here. I thought it was Commissioner Henry. So I'll just lay the scene, clarify who is on the commissioner's court. At the time this plan was adopted, there was one minority commissioner, Stephen Holmes, who was from the majority minority district that was decimated in this case. He voted against the adopted plan. Every single Anglo member of the commissioner's court voted for it. I'm asking about the black commissioner. So Stephen Holmes is a black man. After this plan was adopted, after these lawsuits were filed, the commissioner's court, Judge Henry and Republicans appointed to fill the seat of a commissioner that had passed away, Commissioner Clark. They appointed Robin Armstrong, who is a black man, to fulfill that seat. On the stand, Robin Armstrong agreed. He did not fit the qualifications as a candidate of choice for minority voters. But he did have to run for election in 2022? He did not. He ran unopposed. He did not face a primary. He was appointed. But if he ran unopposed, you're running. I mean, many of us have run unopposed, but it didn't mean we weren't running and on the ballot. I understand that. He ran unopposed, which means that there is no evidence to support that he is the candidate of choice for black voters in the jurisdiction. And you don't even have to tick, actually, on the ballot in this jurisdiction. You don't actually have to tick off to choose him for him to be elected. He ran unopposed. What does that mean that the other people said he's formidable and so we don't want to field a candidate? I mean, when you run unopposed, it means people don't want to run against you. He stated on the stand that he understood he was not a candidate of choice for black voters in this jurisdiction. And that is not on dispute. Had he really not been a candidate of choice and he really been opposed, I believe it could have been write-in votes. Did he get fewer votes than the other commissioners? Your Honor, none of that evidence was adduced at trial because it was not found to be at all relevant, the claims at issue in this case. You are really not so subtly here using race as a proxy for partisan politics. Your Honor, the district court— —who had won several races, he didn't even bother to name those people. Yeah. Well, those don't count either, he said. I just don't understand how the voting—I mean, I thought Allen B. Milliken even said that, you know, you can't— it's a fine line to walk, but when you've got an elected black commissioner who happens to be of the wrong party, does that mean the other blacks in Precinct 3 or whatever would never ask him for help? Your Honor, there is multiple witnesses testifying that Robin Armstrong is not a candidate of choice for minority voters. Multiple, multiple people testified. The court credited that testimony and found that in his opinion. Second of all, there is no dispute that black and Latino voters will have zero opportunity under the adopted plan to elect a candidate of their choice. There is zero—the performance analysis showed it. Dr. Alford, their expert, did not dispute it. There is no dispute that this will prevent black and Latino voters from having any opportunity to elect their candidate of choice. And the district court considered the partisanship. It fully considered that argument. And it found that analysis was based on a single election, and that did not overcome the overwhelming evidence. It did not overcome the overwhelming evidence. These are racially polarized voting patterns. If we were to reconsider at some point the compost, the city of Baytown, which the other side has said that they wish that we should do, would that—would you still be able to prevail if that was—if there was not such a thing as a coalition in that way where neither is the majority? There are certainly other claims available to us. But on that point, the Clement's en banc decision binds this panel to recognize coalition claims within this circuit. The question specifically said if the en banc court were to reconsider, would you still have an argument to prevail? We would still have other claims available to us on remand in this case, which the court did not reach. And I see— Wait a minute. Wait a minute. Wait a minute. You don't argue that the court should—that the case would alternatively be remanded, do you? It would. The court specifically resolved—reserved the intentional discrimination claim under the VRA and the racial gerrymandering claims, and those would go back on remand. And there are—and the court did not reach it, but there are very strong findings that indicate if the court reached those on remand, it would find in favor of plaintiffs. Well, maybe I need to—tell me whether I should ask you about this or one of the other people on your side, because he did not find intentional discrimination. He ruled on—didn't the same judge rule on the justice of the peace courts in Galveston County, and he found no intentional discrimination? That was a different judge, Judge Costa. This is Judge Jeffrey Brown, who specifically reserved the intentional discrimination and racial gerrymandering. And he said, I don't—I'm not ruling on it. He didn't— At least. But he didn't find—he disbelieved. Which witnesses did he disbelieve? Your Honor, he did not credit the commissioners when they said that they had enacted this plan for other reasons. He found zero legitimacy to any of the reasons that they said they used to adopt this plan. I understand that, but not one of those factors. But he never went beyond that. Because of constitutional avoidance, he did not reach our racial gerrymandering and our intentional discrimination under the 14th Amendment. He also found that we would be afforded full remedy under the Voting Rights Effect test. So also the intent claims under the Voting Rights Act are still available to us on remand. He found what happened was mean-spirited, egregious, stark-jarring. He credited expert testimony that this was a textbook example of a racial gerrymander. Under those facts, he would revisit on remand— Where's your citation for the textbook example of racial gerrymandering? Your Honor, that is up front, and it is Record Citation 15885-86, where the Court credited Bill Cooper's testimony. And just one point of clarification—I see I'm over time—but one point of clarification that this Court must know is that the trial court has allowed defendants to put any map that remedies the violation before them. Not just Map 1, not just the Fairfax. Any of the four Cooper that perform the same or better on the criteria they said they wanted. Any of the Rush plans—the Cooper and the Rush plans account for incumbency. They achieve the objectives the defendants purported to want and achieve them at the same or better, including the same coastal precinct they said they wanted. They have provided zero excuse for not enacting those plans. They don't even provide an excuse for not enacting Map 1, and they have provided zero—there is no reason— Was it their burden to prove any of that at trial? Yes, under racial—because the plaintiffs produced alternative plans that fulfilled their criteria. But all that—well, I'm quibbling with you, but all that's just part of the ordinary burden of proof for plaintiffs. And he found for you, and I'm not sure that it was their burden to go in and every plan— well, we might have looked at that, but—we might have looked at that, but— I mean, those are just like, you know, they don't have the burden to prove that all your plans won't work. They have the burden to defend their plan. And they absolutely failed to do that. They absolutely failed to do that. Thank you. Thank you, Your Honors. Could we take time away from the United States, Mr. Dreecombe? Why don't you—I mean, I don't—I'm not trying to be rude, but there's no point in covering exactly the same ground as Ms. Klein. Thank you, Your Honor. May it please the Court. Matthew Drebsen for the United States. I think I'll go in the same sequence of issues that appellants started with. First is, is there a controlling law on whether coalition claims are viable? If you go back to the county's own summary judgment motion in May of 2023, they said there is controlling Fifth Circuit precedent that they are citing the en banc clements decision. I think that was correct, and I think that ends the issue as far as the panel stage in these proceedings. Going to the Jingles preconditions, at the first condition, plaintiffs have to demonstrate the possibility of a reasonably configured district where minority voters are sufficiently numerous, sufficiently compact. I think you heard from counsel on the other side the concession that Map 1 is compact and reasonably configured. And so I think that issue is resolved because you just need one illustration of such a map in order to satisfy the first Jingles precondition. Now, there was abundant additional evidence in the record besides Map 1, but I think that concession settles that issue. Can you help a little bit? Since you're talking about the first precondition, Robinson v. Ardoin says that you can't join discrete communities of interest that differ on socioeconomic status, etc. But Mr. Cooper said that the economic disparity between Texas City and League City make it so that they shouldn't be considered as one unit. Can you opine on that a bit or help us with that? Happy to, Judge Elrod. Expert Cooper was talking about the use of a certain antiquated statistical category by the defense expert, Mark Owens. Owens had used a category of data that lumped Texas City and League City together, and Cooper was explaining why that wasn't right. But the differences between League City and Texas City don't impugn any of the illustrative plans that came from the plaintiff's side, because for the most part, those plans did not include League City. The plans concentrated on Lamarck, Dickinson, City of Galveston, Texas City, which are the major municipalities in the county that have the highest black and Latino population. So the plans don't have a League City problem. Right, that's not a problem for the plaintiff's case. Because even if one were to say League City is very different than Texas City. That's right. I think the record showed at trial that there are countless ways to draw a compact map with a sufficiently numerous minority population, and so that League City issue just is not a problem in this case. So . . . Yes, Your Honor. Assuming arguendo that there were no longer an administrative stay, assuming arguendo, not foreshadowing, what happens in November the 11th or 12th? So once the stay expires, which would be on the 10th, I think that would allow the district court to resume the remedial process that it had originally ordered. But what will people do? Will they be going to sign up for the . . . Which ones will they be going to sign up for? How do they know in the meantime? These are always very difficult time-wise. Certainly, certainly. So we're talking about two elections to this single body. There will be two precinct commissioners on the ballot a year from now in November of 24. So that's what we're really talking about. The district court indicated it was prepared to move expeditiously. It was going to give the county a certain amount of time to draw a map if it wanted to, and then it would have a remedial hearing where it would take input from the plaintiffs and any other interested parties. Now, that would get us into the default candidate qualifying period. But the law of this court is very clear. The district courts have the equitable power to adjust state law election deadlines when necessary. And we are, as I said, a year out from the election. And so the district court could easily tack a few more weeks onto the candidate qualifying deadline so that any interested candidates that want to run under the new map, the remedial map, would have the opportunity to file. Going to the second Jingles precondition, I don't think the county has showed clear error on that precondition. It would have to leave you with the definite and firm conviction that the district court had committed an error. And there was expert consensus here, both that general elections are more probative than primaries, all four experts to opine on that shared that view, and the district court credited that view. So the county would have you rule that the district court committed clear error by listening . . . I don't understand. How could you ever . . . If the whole burden of this is blacks and Hispanics vote for a black candidate or a Hispanic candidate, when it's that versus a white candidate, there's no way to disprove the coalition cohesiveness ordinarily, except by extrinsic evidence, right, other than the voting, right? Well, the cohesion inquiry does focus on voting pattern. Well, I know, but we have several cases, at least two, where the court has held, and I didn't go back and look at them, but that the blacks and Hispanics were not cohesive. So I think in the cases that Your Honor may have in mind, take Overton versus City of Austin as an example. There was both a substantial amount of white voting that was consistent with the minority voters' preferred candidates. So that is one type of showing a defense could try to make. Another is that you don't always see the black voters and Hispanic voters or Latino voters preferring the same candidates. But on this record, you had an enormous number of general elections and primary elections where black and Latino voters in the county were consistently preferring the same candidates. Well, what I'm saying is Judge Brown, I believe, discounted primary elections. Yes, Your Honor, go ahead. And you can qualify that if you like in a second, but I don't see how you could ever disprove minority coalition on the basis of minority candidate versus white candidate. And therefore, it seems to me very relevant to look at primaries where you might have a black candidate and a Hispanic candidate. Right, and that was not in evidence here. First, the district court . . . I'm sorry, Your Honor. What were they trying to show with regard to primary elections? Well, there were twenty-four different primary elections that were considered across the various experts from 18, 20, 22, and then going even further back in the county. And the district court credited evidence from both a plaintiff's expert and a defense expert, Asgui and Alford, that black and Latino voters preferred the same candidate in 22 out of 24. So, there might be another case in the future, and there have been cases in the past, where the primaries show that you have consistent repeat disagreement between black and Latino voters. They consistently prefer different candidates. They cited the Rodriguez versus Pataki case out of the Southern District of New York. That was the nature of the record there. The nature of the record here is that black and Latino voters were highly cohesive in both the general and the primary elections. Well, what do you do with the fact that if they were . . . I suppose this goes to the broader question about cohesion, but the fulcrum of this is electing a black. And there are references in the briefing to the fact, why is the government preferring blacks to Hispanics? I disagree with that, Your Honor. The focus is on electing the preferred candidate of both the black and Latino residents of this county. It happens that the office holder for this precinct is black, but the focus is, who do these voters prefer?  It's about opportunity to participate politically and elect representatives of choice, and so that's what this is really about. As far as who the particular individual is that wins elections, that's a matter for the political process, not for courts. Name me. I mean, there is evidence of Hispanic Republicans winning elections. There is evidence of this Mr. Armstrong running wholly unopposed. So, name me another Section 2 case that has been successful where you had that kind of racial success in the so-called polarized white community. So, I want to point first . . . Name me a case. That's my question. Well, I don't know that in the case law that small number that . . . I think that's three individuals, one of whom was appointed after this litigation commenced, actually shows a meaningful degree of minority success. Well, I know there's loose language and jingles about how we don't . . . we discount the occasional, you know, the exceptional or something like the Edward Brook in Massachusetts, for instance. But, this seems to be very recent, fairly recent within the last decade, and recurrent. So, the district court . . . I can't, can't . . . Go ahead. When is history going to move on? The district court made specific findings on this in its Senate factors analysis because it looked at the success of minority candidates. And, its finding, which is borne out by the record, is that minority candidate success was slow and disproportionately low. And then, also, the district court found that minority candidates succeeding in Galveston County only really experienced that success in majority minority heritage. Actually, they experienced considerable ongoing total success until 2010, didn't they? Because the county was entirely Democrat until 2010. Now, are you saying there was racial polarization before then and the minorities had no opportunity to participate and so on? Well, I think, actually, before 2010, there wasn't a Section 2 problem because . . . Actually, according to what Judge Brown finds, there was constant Section 5 preclearance and so on. That's not true, Your Honor. When Historic Precinct 3 gained the configuration that it had for a 30-year span, it was the 1991 redistricting process. And, there was no litigation that followed that. There was no preclearance objection from the Justice Department. Same thing after the 2000 Census. So, for 20 years, there would not have been a viable Section 2 claim. Well, if your argument is correct, then Alan V. Milligan is wrong. I don't understand, Your Honor. Because that was an agreed, one black congressional district in Alabama. And, for 30 years, nobody . . . I think they lost an interim suit or two, but that was not challenged until suddenly it was. But, what I'm saying, the shoe's on the other foot here because the Democrats dominated Galveston County until 2010. I think if you look at it from the Jingles framework, if you have white voters and minority voters both substantially participating in the politics of the same party, then Section 2 plaintiffs would not be able to get through Jingles 2 or potentially Jingles 3. That's because they are participating in the processes, right? Right. So, it's only . . . okay. If there's nothing further, I would urge affirmance. Thank you. Mr. Dunn. May it please the Court. Chad Dunn on behalf of the Petaway Plaintiffs. The district court, after a year and a half of litigation and two weeks of trial, went through the searching and detailed analysis of the evidence and the testimony in this case as the Supreme Court required of it. And, it found that the racial polarization of the community in Galveston County was stark. In fact, 93% versus 85%. Some of the highest polarization in voting that I have seen doing this work for two plus decades. I want to address the Court's questions, as I've heard them up to this point, on a few issues. On the question of whether or not the plaintiffs have pursued relief in advance of 2022, this Court, of course, ruled in Voting for America v. Andrade that it's a rare voting rights case where a preliminary injunction would be issued in advance of an upcoming election. The map was adopted in November. The filing period started just days later in 2021. There wasn't time for relief in 2022. And, added to that, Precinct 3 was not up for election in 2022. So, following this Court's precedence, the plaintiffs proceeded to trial, a full trial on the merits, seeking an injunction in advance of the material election, the next election for Precinct 3, which was the 2024 and will be the 2024 election. Judge Elrod, you asked the status quo at the moment in the district court, and here is how I understand it. The district court issued an injunction in joining Map 2, finding it stark, mean-spirited, designed to eviscerate the one minority district on the Commissioner's Court. And when it did that, it issued an injunction against that plan, told the county it had an opportunity to draw its own plan, which it has refused to engage in since that order has been issued, and said in the alternative, if the county doesn't adopt a different plan, then when the filing period starts, when the election apparatus rolls, Map 1 will be the map. Now, the testimony at trial on Map 1 is that each of the defendant commissioners were in favor of Map 1. Each of them would have voted for it if only Mr. Commissioner Holmes, the black commissioner, had said please or had asked in the right way. So, why I bring that up is because it affects the stay issues in this case. The government, the county, is complaining that they have serious harm over the imposition of Map 1, a map, though, that they as a majority, the Commissioner's Court majority, has testified it has no problems with. It's also a status quo map. It essentially takes the map from the last decade, makes minimum changes to it. In fact, the testimony at trial was, move one precinct and you could equalize the population among the map. Instead, what the county engaged in was a complete wholesale redraw. So, the question has been asked here, and it's a fair one, what are the cases? There's not a single case from this court or the U.S. Supreme Court that has tolerated the destruction of a minority district like this, not one. In Lovack v. Perry, Justice Kennedy, addressing congressional districts in South Texas, said that that district had not yet even fully performed like this one. It was beginning to perform, the Justice said. But, of course, you only get there because of coalition voting, but we'll pass that by. Sure enough, and that brings me to the Bartlett case. The U.S. Supreme Court says in Bartlett that if there was an intentional destruction of a performing coalition district, that would raise serious constitutional questions. But then, you have to look at why they changed the district, right? Right, and the question of why the district court went through in painstaking detail, listening to each evidence, each exhibit, and each witness, and it found that the government's explanation for intentional destruction of this district did not match the evidence. In other words, it was pretext. But, he never found intentional discrimination. The judge said he was reserving that issue. He did not say he was reserving it. I just reviewed this very carefully. He says, I am not ruling on it because that would be broader than the relief they seek. All they seek is Section 2. Then, he said, in their post-trial briefing, they sought to put Galveston County under preclearance, but that is waived under Rule 9 because never properly pled. Under constitutional avoidance, the trial court properly focused on . . . That does not mean that we could remand it, though. I'll have to respectfully disagree with the court on that point. The trial court issued relief under one claim. If that claim is ultimately vacated or reversed because this court changes the law or otherwise, then the district court has the opportunity to rule on their main . . . Otherwise, the plaintiffs never got due process on the claims that they pleaded. The plaintiffs are entitled to a ruling on the intentional . . . No, he said, I only rule on what you're requesting relief about. Because that got the job done. They got precisely the relief they requested, and if they prevail, they're getting precisely the relief they requested, unless there was some alternate briefing, perhaps, about the question of 3C or something. Quick question, Mr. Dunn. What this says is, I'm looking at the brief for the NAACP. The judgment of the district court should be affirmed, and the motion for stay denied. Then I look at the . . . The district judgment should be affirmed, and the motion for stay denied. And finally, the U.S. brief, the court should affirm the district court's judgment. I'm sorry, Your Honor. I missed the question somehow. I agree, that's a relief . . . or the conclusions to the scope of the relief sought. He found that to go further would only be necessary if they were going after 3C relief, which he said they have waived. Nobody asked for 3C relief up here. I continue to believe that the case law says if this court vacates the court's remedy and ruling under the statutory claim, the trial court needs to rule on the constitutional claims. Judge Alrod, did you have a . . . Just a question about if we were to revisit coalition, there's a circuit split either way, right? We would not alter that, the universe. That's right. And the statutory argument just hasn't . . . The statutory argument that somehow the Voting Rights Act is limited to single race claims just hasn't developed in the last 30 years. There's one case on it at the Sixth Circuit. No other courts have picked up on that. I respect that this court and two members of it dissented in Clements, but one of the arguments that was made there is if we allow coalition claims, we'll have this avalanche of plaintiff's cases that will create Democratic districts or partisan districts. None of that came to pass. This is the intentional destruction of a district. This is Galveston, Texas, feet from this courthouse. Until 2010, Galveston, Texas was entirely Democrat. Are you saying that suddenly everybody, you know, the majority . . . It has to be a lot of the same people who changed their votes from Democrat to Republican, and you're basically implying that they've all become racist in 12 years because they vote Republican. I'm implying nothing. The data which the court found and is not clearly erroneous about is this is stark racial polarization between the white community and the black and Latino communities that vote. There's political polarization evidently. The court went through that in painstaking detail. But up until 2010, there was not political polarization. There was not political polarization because the number of white citizens in Galveston County voted for black and Latino candidates. That's no longer true. That's why the court found, as it did, as it was required to do under the precedents, that this high degree of racial polarization results in the block voting of the minority candidate from here on out. There will not be a candidate. If this court takes the action to affirm this and leaves this stay in place, there will not be a candidate in Galveston, Texas . . . No. . . . representing the black and Latino community. Do you live in Houston? I did, Your Honor. I grew up in Houston. I live in Austin at the moment. Well, the irony with what happened in Harris County is apparent. There is one district in Harris County that is majority white that elects a Republican candidate of choice. The avalanche will come if this court decides that the racial majority can eliminate all of the districts of the racial minorities. It will be flooded with cases where the racial majority does that in counties, cities, school districts throughout these three states. Thank you for the court's careful attention in this case. We ask for affirmance and lifting of the stay. Thank you. I wanted to follow up with just a few record citations for the court. To begin with, Commissioner Armstrong, who is African-American, not only ran unopposed in the Republican contest in 2022, he ran against several Anglo-Republicans in the Republican Party in Galveston County so that he could run in the election in 2022. You can look at the record site for that. It's 19491-92 to support that. It's also referenced in page 21 of our reply brief. Now, obviously, I know that our friends on the other side discount the county for not going and enacting Map 1 while this appeal is pending post-October 13th. But obviously, the inability to enforce a duly enacted plan amounts to irreparable harm. And that's why we've asked this court for a stay. And that's why we've asked this court to stay the implementation of any other plan than the duly enacted plan throughout the pendency of this appeal. Now, the timeline I believe that Judge Elrod was concerned with earlier as well, we have February 20th is when the early voting starts for primary elections. And that would obviously be impacted if you start working backwards in time to get our county clerk and their ability to enact and make all of the changes to the voting tabulation districts in order to create the ballots. And so it is a pretty tight timeline for the court. Now, in terms of primaries, I did want to point the court to the record at 15563-64 at paragraph 383. And it's a spot where Dr. Alford is talking about the large confidence intervals. And that's also at page 17 of our reply brief. You need to furnish us a 28-J letter with those citations, please. Yes, Your Honor. What do you say about the intentional discrimination issues? There is no intentional discrimination finding. This is not an intent appeal. It was not an intent judgment. Am I not correct? I could be wrong. I read this late last night. But I thought in his findings, it was clear that the demographer did not draw Map 2 with an eye about race. No. The demographer was instructed not to consider race. But he was, according to the judge, your attorney, Mr. Oldham, gave him parameters that he had to use. Right. And if memory serves, those parameters were to create a least change map, which would be Map 1, and to create a coastal precinct map, where you build from, you know, all of Galveston Island through Bolivar Peninsula, build that up. And then you try to grab the county's population, because it's very dense in the northern part of the county. So you'll have the larger precincts down toward the coast and smaller up toward the front or the top to account for the suburbs of Houston, where people, the majority of the county, live. Now, just very briefly on Bartlett, we understand that the Supreme Court has been rejecting sub-majority claims for quite some time. At this point in time, in pointing the court to the judicial watchmaches, you know, the only limiting factor when you have a political coalition raising a VRA claim is that the coalition preferred candidate lose the general election. And when you start discounting primary elections and primary data, that's exactly what happened in this case. Is there no further questions? No, ma'am. Thank you. Court will be in recess.